NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN CAPITAL ACQUISITION PARTNERS, LLC, et al., | |
| Plaintiffs, | Civ. No. 13-5571 |
| v. | OPINION |
| FORTIGENT, LLC and Andrew PUTTERMAN, | |
| Defendants. | |

THOMPSON, U.S.D.J.

## I. INTRODUCTION

This matter is before the Court upon the motion to dismiss filed by Fortigent, LLC and Andrew Putterman (collectively, "Defendants"). (Docket No. 8). American Capital Acquisition Partners, LLC ("American"), Lee Argush, Nicholas Mariniello, and Alan F. Gavornik (collectively, "Plaintiffs") oppose this motion. (Docket No. 14). The Court has decided the matter upon consideration of the parties' written submissions and oral arguments. For the reasons given below, Defendants' motion to dismiss is granted.

## II. BACKGROUND

*A. Factual Background*

Prior to June 22, 2011, American, a New Jersey limited liability company, owned 61.67% of Concord Wealth Management ("Concord").[1] (Docket No. 1, Ex. A at 2, ¶ 9). Plaintiffs Lee Argush, Nicholas Mariniello, and Alan Gavornik are the owners of American. (*Id*. at 2, ¶ 9). Prior to June 22, 2011, Argush, Mariniello, and Gavornik owned 61.67% of Concord through

---

[1] Concord provides "technology and open architecture investment management solutions for trust departments of financial institutions." (Docket No. 14 at 2).

their ownership of American and acted as directors and senior officers of Concord. (*Id*. at 2, ¶ 9). Non-party Financial Services Partners Fund I, LLC ("Financial Services Partners") owned the remaining 38.33% of Concord. (Docket No. 1, Ex. A at 2, ¶ 9). The graph below illustrates the organization of the relevant parties before June 22, 2011.



On April 20, 2011, American and Financial Services Partners entered into a stock purchase agreement (the "SPA") with non-party LPL Holdings, Inc. ("LPL Holdings"). (*Id*. at 2, ¶ 6). Pursuant to the SPA, LPL Holdings paid $22.5 million for ownership of equity interests of Concord. (Docket No. 8 at 4). The SPA and a June 22, 2011 closing transaction resulted in the following organizational structure: (1) Concord became a subsidiary of LPL Holdings (the subsidiary that Concord became will hereinafter be referred to as "Concord-LPL"); (2) Argush, Mariniello, and Gavornik became senior executives of Concord-LPL; (3) Argush, Mariniello, and Gavornik became at-will employees of LPL Financial, LLC (hereinafter, "LPL Financial"), a

subsidiary of LPL Holdings; and (4) Argush began reporting directly to an officer of LPL Financial.  (Docket No. 1, Ex. A at 2-3, ¶¶ 8-12).  The graph below illustrates the organization of the relevant parties in July 2011.



Pursuant to the SPA, LPL Holdings also agreed to additional purchase price payments contingent upon Concord-LPL reaching certain revenue targets. (*Id*. at 3, ¶ 14).[2]  Argush, Mariniello, and Gavornik's employee agreements (hereinafter, "Employee Agreements") with

---

[2] Specifically, Section 2.06(a) set forth the following contingent purchase price payment of up to $15 million by LPL Holdings:

> (a)     Contingent Payment.  In addition to the Closing Purchase Price payable at Closing, and subject to the terms and conditions set forth in this Section 2.06, [American and Financial] shall be entitled to an additional purchase price payment from [LPL] in an aggregate amount, if any (such aggregate purchase price payment is referred to herein as the "Contingent Purchase Price Payment") of (i) for every $250,000 in 2013 Gross Margin in excess of $5,500,000 but less than or equal to $7,250,000, $215,000 up to a maximum payment of $1,500,000 and (ii) for every $250,000 in 2013 Gross Margin in excess of $7,250,000, $675,000 up to a maximum payment of $13,500,000; provided, however, the maximum Contingent Purchase Price Payment shall not exceed $15,000,000.

(Docket No. 1, Ex. A at 3, ¶ 15).

LPL Financial also provided for additional incentive compensation based upon Concord-LPL reaching "time-sensitive revenue targets."[3]  (*Id*. at 3, ¶ 16).

In April 2012, LPL Holdings acquired Fortigent, LLC ("Fortigent"), a Maryland-based limited liability company.[4]  (*Id*. at 4, ¶ 20).  After the April 2012 transaction, Fortigent became a subsidiary of LPL Holdings[5] and established a reporting relationship to LPL Holdings and LPL Financial.  (*Id*. at 4, ¶ 21).

Shortly after LPL Holdings acquired Fortigent, Argush was directed by LPL Financial to report to Andrew Putterman, Fortigent's CEO.  (*Id*. at 4, ¶ 22).  Through that reporting relationship, Fortigent and Putterman allegedly became aware of the additional purchase price payments that would be owed to Plaintiffs if Concord-LPL reached certain revenue targets.  (*Id*. at 5, ¶ 23).  The graph below illustrates the organization of the relevant parties in April 2012.

---

[3] The revenue targets were set in the Employment Agreements and were defined as "Net Revenue Generated from Concord's Custodial Assets" of $975,000 for 2011, $3,750,000 for 2012, and $7,700,000 for 2013. (Docket No. 1, Ex. A at 4, ¶ 17).

[4] Fortigent is "a provider of investment and consulting services to registered investment advisors, banks and trust companies." (Docket No. 1, Ex. A at 4, ¶ 20).

[5] LPL Holdings' public filings confirm that both Fortigent and Concord-LPL are wholly owned subsidiaries of LPL Holdings.  (Docket No. 15 at 6, n. 5).  In deciding a motion to dismiss, a court may consider matters of public record.  *Cephalon, Inc. v. Sun Pharmaceuticals, Ltd.*, 11-CV-5474, 2013 WL 5533468, at *1 (D.N.J. Oct. 7, 2013).



Plaintiffs claim that Fortigent and Putterman attempted to prevent Plaintiffs from receiving the contingent purchase payments set out in the SPA and Employment Agreements. (*Id.* at 5, ¶ 24). Plaintiffs specifically cite the following disruptive activities:

- In October 2012, LPL Financial held a senior management meeting attended by Fortigent and Putterman where an agreement was made to "pivot" sales from Concord-LPL to Fortigent. (*Id.* at 5, ¶ 25). In addition, Concord-LPL's pending sales were put on hold. (*Id.*). Concord-LPL executives were excluded from this meeting. (*Id.*).

- Fortigent and Putterman delayed beneficial computer updates until after the time set in the SPA and Employment Agreements for determining whether Concord-LPL reached revenue targets. (*Id.* at 5, ¶ 26).

- A Fortigent employee told an existing Concord-LPL trust client to stop entrusting assets to Concord-LPL because Concord-LPL was being merged into Fortigent. (*Id.* at 6, ¶ 30). Plaintiffs additionally claim that visits were made to Concord-LPL's clients by Fortigent and LPL Financial executives without Concord-LPL personnel present. (*Id.* at 6, ¶ 34).

- At meetings on June 4-5, 2013, Putterman and others told Concord-LPL employees that Concord's business was being transitioned to Fortigent and that this transition could potentially impact people's jobs. (*Id.* at 6, ¶ 36).

Based on the foregoing allegations, Plaintiffs assert three claims for relief: (I) tortious interference with prospective advantage; (II) tortious interference with contract; and (III) civil conspiracy.

*B. Procedural History*

This action was commenced on August 9, 2013, by the filing of a Complaint and Jury Demand in the Superior Court of New Jersey, Law Division, Monmouth County. (Docket No. 1 at 1). Counsel for the Defendants accepted service of the Summons and Complaint on August 20, 2013. (*Id.*). Defendants removed this action to the United States District Court for the District of New Jersey on September 19, 2013. (*Id.*). Removal was proper pursuant to 28 U.S.C. § 1332 because all of the plaintiffs are citizens of New Jersey, all of the defendants are citizens of Maryland, and the amount in controversy exceeds $75,000. Defendants filed the motion to dismiss, which is the subject of this opinion, on October 10, 2013. The Court heard the parties' oral arguments on February 6, 2014.

### III. DISCUSSION

**A.** *Legal Standards*

Defendants move to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

i. *12(b)(1)*

Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim. "A motion to dismiss for want of standing is . . . properly

brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir.2007). In evaluating whether a complaint adequately pleads the elements of standing, the Court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

ii. *12(b)(6)*

A motion under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F. 3d 176, 183 (3d Cir. 1993). The defendant bears the burden of showing that no claim has been presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). When considering a Fed. R. Civ. P. 12(b)(6) motion, a district court should conduct a three-part analysis. *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id*. (quoting *Ashcroft v. Iqbal*, 56 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court may disregard any conclusory legal allegations. *Id*. Finally, the court must determine whether the "facts are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679). Such a claim requires more than a mere allegation of an entitlement to relief or demonstration of the "mere possibility of misconduct;" the facts must allow a court reasonably to infer "that the defendant is liable for the misconduct alleged." *Id*. at 210, 211 (quoting *Iqbal*, 556 U.S. 678-79).[6]

---

[6] There are limitations on the materials a court can consider at the Fed.R.Civ.P. 12(b)(6) stage: "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings . . . . However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered . . . ." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

**B.** *Analysis*

Plaintiffs' Complaint alleges three claims: (I) tortious interference with prospective advantage; (II) tortious interference with contract; and (III) civil conspiracy. Each claim for relief is addressed individually below.

*Count I: Tortious Interference with Prospective Advantage*

Defendants seek to dismiss Count I of the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). The Court need only address Count I with respect to Fed. R. Civ. P. 12(b)(1) for lack of standing.

Essential to Article III jurisdiction is the doctrine of standing. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180 (2000). "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 497-98 (1975) (citing *Baker v. Carr,* 369 U.S. 186, 204 (1962)).

Here, Plaintiffs assert that Defendants are liable for tortious interference with prospective advantage for interfering with business opportunities that were available to Concord-LPL, a non-party to this action. An action for tortious interference with prospective advantage "protects the right to pursue one's business, calling or occupation free from undue influence or molestation." *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 750 (1989) (citation omitted). What is actionable is "[t]he luring away, by devious, improper and unrighteous means, the customer of another." *Id*. The tort arises out of the relationship between three parties: the parties to the prospective economic relationship and the interferer. *See id*; *see also K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 154 (1989).

To have standing to bring a claim for tortious interference with prospective advantage, "a plaintiff must establish injury to a prospective economic relation from the defendant's tortious interference."  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 194-96 (3d Cir. 1992) (citing *Printing Mart-Morristown*, 563 A.2d at 38–39).  "Prospective economic relation" is broadly defined under New Jersey law to include "the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts." *Id*. (citing *Printing Mart,* 563 A.2d at 39); *see also* RESTATEMENT (SECOND) OF TORTS § 766B.

Here, Plaintiffs' Complaint alleges that Defendants interfered with the "the present and future clients of Concord and Concord-LPL" and "intentionally interfered with Concord-LPL's reasonable business opportunities and have substantially prevented Concord-LPL from attaining revenue goals set out for Plaintiffs and their contingent payments."  (Docket No. 1, Ex. A at 7, ¶¶ 39-46).  However, the Complaint fails to allege that Defendants' actions harmed Plaintiffs' own prospective economic relationships.  (*Id*.).  Plaintiffs only claim damages that flow from Defendant's tortious interference with Concord-LPL — Plaintiffs do not have standing to bring such a claim.  *Fineman,* 980 F.2d at 195 (3d Cir.1992).  Plaintiffs gave up the right to bring claims on behalf of Concord when they sold the company to LPL Holdings.

Thus, Plaintiffs do not have standing to bring a claim for tortious interference with prospective advantage because Plaintiffs have not established that any of Plaintiffs' own prospective economic relationships, separate and distinct from Concord-LPL's prospective economic relationships, were damaged by Defendants' actions.

*Count II: Tortious Interference with Contract*

Defendants seek to dismiss Count II of Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Under New Jersey law, tortious interference with an existing contract is defined as follows:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Nostrame v. Santiago*, 213 N.J. 109, 122 (2013). An action for tortious interference with contract protects "parties to an existing . . . contractual relationship from outside interference." *Printing Mart-Morristown*, 116 N.J. at 752-53. A cause of action for tortious interference with contract can only be "directed against defendants who are not parties to the relationship." *Id*. This is because a party to a contract cannot be held liable "both for breach of that contract and for inducing that breach." *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994); *see also Printing Mart-Morristown*, 116 N.J. at 760-61.

Plaintiff is suing Defendants for interfering with a contract between Plaintiffs, LPL Holdings, and LPL Financial. As a preliminary matter, the Court must determine whether it is legally possible for Fortigent and Andrew Putterman to interfere with a contract between Plaintiffs, LPL Holdings, and LPL Financial. The court will analyze each Defendant individually.

a. *Fortigent*

Plaintiffs claim Fortigent interfered with a contract between Plaintiffs, LPL Holdings, and LPL Financial. Fortigent is a subsidiary of LPL Holdings. (Docket No. 15 at 6, n. 5). LPL Financial is also a subsidiary of LPL Holdings; therefore, Fortigent and LPL Financial are

corporate affiliates. (*Id*.). The question before the court is whether Fortigent qualifies as a third party legally capable of interfering with LPL Holdings and LPL Financial's contracts.

Under Delaware Law,[7] "where corporations affiliated through joint ownership confer with respect to a contract to which one of them is party and a breach of that contract follows, there can be no non-contractual liability to the affiliated corporation, which is privileged to consult and counsel with its affiliates, unless the plaintiff pleads and proves that the affiliate sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure plaintiff." *Shearin*, 652 A.2d at 591.

When considering bad faith in tortious interference with contract cases, New Jersey courts weigh "the nature of and motive behind the conduct, the interests advanced and interfered with, societal interests that bear on the rights of each party, the proximate relationship between the conduct and the interference, and the relationship between the parties." *Nostrame*, 213 N.J. at 122 (citing RESTATEMENT (SECOND) OF TORTS § 766). When considering these, New Jersey courts ultimately focus on whether a defendant's conduct "was sanctioned by the rules of the game." *Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 306–307 (2001).[8]

Here, Fortigent, LPL Holdings, and LPL Financial are corporate affiliates. Therefore, they are privileged to confer "with respect to a contract to which one of them is a party." *See Shearin*, 652 A.2d at 591. Fortigent cannot be held liable for tortuously interfering with its corporate affiliates' contracts unless Plaintiffs plead facts suggesting Fortigent "sought

---

[7] There is an absence of pertinent New Jersey case law analyzing this issue. Therefore, the Court looks to Delaware law to analyze this issue. *IBS Fin. Corp. v. Seidman & Associates, L.L.C.*, 136 F.3d 940, 949-50 (3d Cir. 1998) ("When faced with novel issues of corporate law, New Jersey courts often looked to Delaware's rich abundance of corporate law for guidance.").

[8] Acts of interference involving "violence, fraud, intimidation, misrepresentation, criminal or civil threats, and/or violations of the law" clearly violate the "rules of the game" and always constitute bad faith. *Nostrame*, 213 N.J. at 124 (citations omitted).

maliciously or in bad faith to injure plaintiff." *See id*. Plaintiffs' Complaint states the following with respect to Fortigent's alleged bad faith:

> Fortigent and Putterman acted maliciously and in bad faith to injure the plaintiffs with the intent to cause the breach by LPL and LPL Financial of the agreements, including a breach by LPL of section 2.06(a) of the Agreement and by LPL Financial of the Employment Agreements.[9]

(Docket No. 1, Ex. A at 8, ¶ 50). Plaintiffs' conclusory statement does not include factual allegations suggesting that Fortigent sought, in bad faith, to injure Plaintiffs.

Because Plaintiffs have not shown that Fortigent acted in bad faith, Fortigent cannot be held liable for tortuously interfering with its corporate affiliates' contracts. Therefore, Defendants' motion to dismiss Count II, with respect to Fortigent, is granted.

    2. *Andrew Putterman*

Plaintiffs claim Andrew Putterman, Fortigent's CEO, interfered with a contract between Plaintiffs, LPL Holdings, and LPL Financial.

In New Jersey, "a clear-cut consensus has emerged that if an employee or agent is acting on behalf of his or her employer or principal, then no action for tortious interference will lie." *DiMaria Const., Inc. v. Interarch*, 351 N.J. Super. 558, 568 (App. Div. 2001) *aff'd,* 172 N.J. 182, 797 (2002). The Third Circuit has held that an employee falls outside the scope of his employment if the employee "acts for personal motives, out of malice, beyond his authority, or

---

[9] Plaintiffs' Complaint does not even adequately allege a breach of contract. *See DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 566 (D.N.J. 2002) ("[O]ne interferes with a contract only where he causes a party not to perform under it. As noted, a plaintiff must show that the defendant's intentional and malicious interference resulted in a breach or loss of the contract."). The only contractual provision before the Court is the contingent payment provision of the SPA, Section 2.06(a), which provides that Plaintiffs are eligible to receive time-sensitive contingent purchase price payments based upon Concord-LPL meeting certain revenue targets. (Docket No. 1, Ex. A at 3, ¶ 15). Plaintiffs' allegations that Defendants attempted to divert Concord-LPL customers does not suggest a breach of that contract provision.

otherwise not in good faith in the corporate interest." *Varrallo v. Hammond Inc.,* 94 F.3d 842, 849 n. 11 (3d Cir.1996).

Here, Plaintiffs suggest that Putterman acted outside the scope of his employment as CEO of Fortigent for the following reasons:

- Putterman delayed beneficial computer changes until after the time periods expressed in the Employment Agreements and SPA for determining whether Concord-LPL reached revenue targets; and
- Putterman directed the Concord-LPL sales force to stand down on recommending plaintiffs' services to potential clients and advised a long-existing client to stop entrusting its assets to Concord-LPL and transition to a non-existent Fortigent platform.

(Docket No. 1, Ex. A at 6, ¶¶ 29-24). These facts do not show that Putterman acted outside the scope of his employment. Plaintiffs have not alleged facts suggesting that Putterman acted "for personal motives, out of malice, beyond his authority, or otherwise not in good faith in the corporate interest." *Varrallo,* 94 F.3d at 849 n. 11. Thus, Putterman cannot be held individually liable for tortious interference with contract.

Defendants' motion to dismiss Count II, with respect to Putterman, is granted.

*Count III: Civil Conspiracy*

Defendants seek to dismiss Count III of Plaintiffs' Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

To sustain a claim for civil conspiracy, a plaintiff must plead facts plausibly suggesting the following: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be

achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003) (citations omitted).

Here, Plaintiffs fail to satisfy the first element of a claim for civil conspiracy: "a combination of two or more persons." *Id*. Plaintiffs allege that "acting in concert and confederation with LPL Holdings and LPL Financial, defendants Fortigent and Putterman . . . acted to cause plaintiffs additional damages." (Docket No. 1, Ex. A at 9, ¶ 57). LPL Holdings, LPL Financial, Fortigent, and Putterman are incapable of forming a conspiracy because "a parent corporation and its subsidiaries are 'legally incapable of forming a conspiracy with one another.'" *Premio Foods, Inc. v. Purdue Farms, Inc.*, 11-CV-4968, 2012 WL 3133791, at *6 (D.N.J. July 30, 2012) (quoting *United States v. Chubb Inst.*, 69-CV-3562, 2010 WL 1076228, at *10 (D.N.J. March 22, 2010)). Putterman, acting as an agent of Fortigent, also could not have conspired with LPL Holdings, LPL Financial, or Fortigent because "officers or agents . . . acting in their corporate capacity cannot conspire with the corporation." *DiMaria Const., Inc.,* 351 N.J. Super. at 568.[10]

Additionally, Plaintiffs fail to allege any facts suggesting "the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means." *Morganroth & Morganroth*, 331 F.3d at 414.

Therefore, Defendants' motion to dismiss Count III is granted.

---

[10] As discussed above, Plaintiff has not alleged any facts to suggest that Putterman acted outside his corporate role in pursuit of personal motives. *See Varrallo*, 94 F.3d at 849 n.11.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion to dismiss is granted. An appropriate order will follow.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.

Date: March 21, 2014